Jane Doe *vs.* Jeffrey Senechal & others.[1]

No. 04-P-776.

Essex. September 8, 2005. - April 12, 2006.

Present: Perretta, Smith, & Berry, JJ.

*Emotional Distress. Negligence,* Emotional distress, Employer. *Civil Rights,*
   Availability of remedy. *Practice, Civil,* Judgment, Amendment, Judgment
   notwithstanding verdict. *Judgment,* Amendment.

In a civil action against an intensive residential treatment center for mentally
   ill adolescents, its owner, and several of its officers and employees, arising
   out of the sexual abuse of the plaintiff while she was civilly committed at
   the center, the judge properly granted the motion of two individual
   defendants for judgment notwithstanding the verdict on the plaintiff's
   negligence claim, where there was no evidence that the defendants' failure
   to investigate after learning of the actions of one of the center's employees
   resulted in direct physical harm to the plaintiff [76]; moreover, the judge
   acted within his discretion in ruling after trial that he had erred earlier in
   allowing the plaintiff to amend her complaint, after the parties had rested,
   to reinstate a claim of emotional distress caused by the failure to
   investigate, which she had voluntarily dismissed on the first day of trial,
   where the individual defendants were prejudiced by the earlier ruling
   [76-78].
In a civil action against an intensive residential treatment center for mentally
   ill adolescents, its owner, and several of its officers and employees, arising
   out of the sexual abuse of the plaintiff while she was civilly committed at
   the center, the judge properly allowed partial summary judgment in favor
   of several of the defendants on the plaintiff's claims for alleged violations
   of Federal and State civil rights, where, for purposes of the claim under the
   Massachusetts Civil Rights Act, the plaintiff failed to demonstrate that the
   employee of the center who had sexual intercourse with the plaintiff used
   physical or moral force against her to constrain her against her will to do
   something she would not otherwise have done [78-79]; and where, for
   purposes of the claim under the Federal Civil Rights Act, the plaintiff
   failed to demonstrate that the defendants could be considered State actors
   [79-81].
The judge in a civil action did not err in granting the motion of certain
   defendants to amend the judgment while denying the plaintiff's motion,

---

[1]Robert Johnston, Donald Mosher, Ed Hovestadt, AIG Claim Services, Inc.,
and National Union Fire Insurance Company. The latter two defendants did
not participate in briefing this appeal.

where the judge's ruling caused the damages to better reflect the jury's findings on the liability of one of the defendants. [81]

In a civil action against an intensive residential treatment center for mentally ill adolescents, its owner, and several of its officers and employees, arising out of the sexual abuse of the plaintiff while she was civilly committed at the center, the judge properly denied the motion of one individual defendant for judgment notwithstanding the verdict, where there was sufficient evidence to permit the jury to conclude that that defendant's decision to allow one of the center's employees to escort the plaintiff alone was negligent, and that it was reasonably foreseeable, in view of the plaintiff's history of mental illness and her feelings toward that employee, that sexual contact would occur [81-83]; further, the judge committed no error of law or abuse of discretion in denying that individual defendant's motion for a new trial [83].

CIVIL ACTION commenced in the Superior Court Department on November 14, 1997.

The case was tried before *Thomas P. Billings*, J., and posttrial motions were heard by him.

*Leonard H. Kesten* (*Jocelyn M. Sedney* with him) for the plaintiff.

*John P. Ryan* (*Harry A. Pierce* with him) for Robert Johnston & others.

SMITH, J. In November of 1997, the plaintiff filed a complaint in the Superior Court against Westlake Academy (Westlake); Health & Education Services, Inc. (HES); and Jeffrey Senechal.[2] The plaintiff alleged that while she was civilly committed to Westlake, a facility located in North Grafton, Senechal, a supervisor there, sexually abused her and as a result, she became pregnant. At the time, HES owned Westlake and operated it under a contract with the Massachusetts Department of Mental Health (DMH). The plaintiff asserted claims against Senechal for assault and battery, negligence, and intentional and negligent infliction of emotional distress. As to Westlake, the plaintiff alleged claims of negligence; negligent security; negligent hiring, training, and supervision; and intentional and negligent infliction of emotional distress. Against HES, the plaintiff also alleged claims of negligence, negligent security, and intentional and negligent infliction of emotional distress.

---

[2]Alan Burch, a fourth defendant, was removed when the plaintiff amended the complaint a month later. The counts against Westlake and HES were voluntarily dismissed by the plaintiff before trial. See *infra* at 70-71, 78 n.8.

In December of 1998, the plaintiff amended her complaint by adding Robert Johnston, Donald Mosher, and Ed Hovestadt as defendants,[3] asserting negligence; negligent hiring, supervision and training; and intentional and negligent infliction of emotional distress against each of them. In her amended complaint, the plaintiff also added claims for violations of her State and Federal civil rights as to all of the defendants.[4]

In April of 2000, the defendants moved for partial summary judgment. The motion was allowed as to all State and Federal civil rights claims against all of the defendants, the negligence claim against Senechal, and the claim of negligent hiring as to Johnston.

Before the jury trial commenced, the plaintiff stipulated that all of her claims against HES and Westlake were to be dismissed with prejudice. The plaintiff also stipulated that all of her negligent hiring claims against any and all remaining defendants were to be dismissed with prejudice. She also stipulated to the dismissal with prejudice of her claim of assault and battery by Senechal, as well as the claims for intentional infliction of emotional distress as to Johnston, Mosher, and Hovestadt. Furthermore, the plaintiff agreed orally on the first day of trial to dismiss her claims for negligent infliction of emotional distress against the latter three defendants, apparently reasoning that the same damages were recoverable on the other negligence claims against them. Also on the first day of trial, the judge allowed the plaintiff's unopposed motion to amend the complaint to conform to the evidence, by alleging that after June 23, Johnston, Mosher, and Hovestadt were negligent in failing to investigate the plaintiff's claims of abuse. After the defendants rested, the judge, over a timely defense objection asserting

---

[3]As alleged in the complaint, Johnston was vice-president of child and adolescent services for HES; Mosher was Westlake's quality improvement coordinator and a supervisor of Senechal, and Hovestadt was Westlake's residential director and Senechal's supervisor. Johnston testified at trial that he was director of residential services for HES.

[4]The judge subsequently allowed a third amended complaint, adding G. L. c. 93A and G. L. c. 176D claims against AIG Claim Services, Inc., and National Union Fire Insurance Company. The actions against these two defendants were stayed until the entry of the amended judgments pursuant to Mass.R.Civ.P. 54(b), 365 Mass. 820 (1974), against Senechal, Hovestadt, Mosher, and Johnston.

prejudice, allowed the plaintiff's oral motion to add back to her complaint the claims of negligent infliction of emotional distress against Johnston and Mosher that she had waived on the first day of trial.

A jury returned verdicts in favor of the plaintiff against all of the defendants. According to the docket entries, the jury ordered Senechal to pay the plaintiff $1,250,000, Hovestadt to pay the plaintiff $750,000, and Johnston and Mosher to pay her $250,000.

The defendants (Senechal excepted) filed a motion for a new trial and for judgment notwithstanding the verdict. Johnston and Mosher also filed a motion to amend the final judgment to clarify the nature and extent of the plaintiff's recovery against Senechal and Hovestadt. The plaintiff likewise filed a motion to amend the judgment, which was denied without a hearing. After a hearing, a Superior Court judge, who was the trial judge, denied the motion for a new trial, denied Hovestadt's motion for judgment notwithstanding a verdict, and allowed Johnston and Mosher's motion for judgment notwithstanding the verdict. The judge also ordered that the final judgment be amended as follows: the plaintiff was to recover from Senechal the sum of $500,000 plus interest, and recover from Senechal and Hovestadt the amount of $750,000, plus interest.

On appeal, the plaintiff claims that there was error in (1) allowing Mosher and Johnston's motion for judgment notwithstanding the verdict, (2) denying the plaintiff's motion and allowing the defendants' motion to amend the judgment, and (3) granting partial summary judgment in favor of the defendants.

Hovestadt cross-appeals, claiming that the judge committed error in denying his motion for judgment notwithstanding the verdict and his motion for a new trial.

*Facts.* We recite the relevant facts in the light most favorable to the plaintiff. We reserve certain facts for discussion in regard to particular issues.

Born in 1977, the plaintiff became mentally ill from long-term sexual abuse by several male family members. As a result, she became a ward of the State of Maine, which agreed to pay for her treatment until she reached the age of eighteen. By virtue of an interstate compact, she came under the care of

DMH. At the age of sixteen, she was civilly committed to West-lake, a secure, intensive residential treatment center for mentally ill adolescents with a maximum capacity of thirteen residents. Teenagers admitted to the program were involuntarily commit-ted for psychiatric treatment under civil commitment laws. HES, a private nonprofit company, operated Westlake under its contract with DMH from 1985 until 1995.

At the time of the alleged sexual misconduct by Senechal, the plaintiff was seventeen years old and was considered to be a "mentally ill adolescent," defined in 104 Code Mass. Regs. § 2.14(5) (1993) as "an adolescent whose mental illness is characterized by a substantial disorder of thought, mood, percep-tion, orientation, or memory which grossly impairs judgment, behavior, capacity to recognize reality or ability to meet the ordinary demands of life, but should not include alcoholism."

While at Westlake, the plaintiff manifested her mental problems by behaving in sexually provocative ways, especially toward males. That conduct was well known by Westlake's supervisors. To reduce her exposure to exploitive situations, she was not to be alone with a male staff member at any time.[5] In fact, one of the reasons the plaintiff was confined to a locked facility was her inability to behave in an appropriate, safe and nonsexual manner toward males.

In May of 1995, as the plaintiff's eighteenth birthday ap-proached (a date that would mark the termination by Maine of its funding of her commitment to Westlake), it was decided that she would leave Westlake on June 23 to spend a couple of months in a program in Maine, close to her mother's home. In advance of the plaintiff's transfer, Maine authorities requested that the plaintiff be allowed to spend some weekends with her mother in Maine. Westlake agreed to the request, and at the time of the first weekend visit, the plaintiff's mother drove from Maine and brought the plaintiff home for a weekend. At the end of that weekend, however, the mother, after bringing the plaintiff

---

[5]In 1994, the plaintiff claimed that she had two instances of sexual intercourse (one oral, the other vaginal) with a male staff member, not Senechal. In turn, Westlake, a mandated reporter under G. L. c. 119, reported the plaintiff's claim to the Department of Social Services, which found no reasonable cause to support the allegations.

back to Westlake, informed the supervisors that she would be unable to drive the plaintiff to Maine in the future. As a result, it was decided that the plaintiff would take a bus from South Station in Boston to Portland, Maine, with Westlake assuming the responsibility of transporting the plaintiff to and from South Station.

Although Westlake's in-house regulations prohibited male staff members from transporting female residents alone, Hovestadt permitted Senechal to transport the plaintiff from Westlake to South Station by himself.[6] The permission was granted even though Senechal had informed shift supervisors that the plaintiff was behaving in a sexually provocative manner toward him.

Senechal drove the plaintiff to South Station on June 9. He also drove her to South Station June 16 and back to Westlake on June 18. Senechal had sexual relations with the plaintiff on each occasion during the transports.

On June 23, the plaintiff was to leave Westlake for the program in Maine. On that date she gave a staff member a sealed envelope addressed to Senechal, together with a shirt. She asked the staff member to give the items to Senechal but not to open the letter. After the plaintiff left Westlake on June 23, the staff member opened and read the letter. It described sexual acts, including intercourse, that the plaintiff had engaged in with Senechal, and indicated an intention to see him again.

On June 26, Johnston, HES's director of residential services, was informed of the contents of the letter. On that date, a staff member reported the matter to the Department of Social Services, which refused to investigate in view of allegedly unfounded accusations the plaintiff had made in the past.

In July, the plaintiff discovered she was pregnant. When she called Senechal to inform him of her condition, he told her not to call him again. The plaintiff's mother called Westlake and confronted Senechal with the plaintiff's statement that he was the father of her child. Senechal denied it and suggested that another person not connected with Westlake was probably the father.

---

[6]In addition to being Senechal's supervisor, Hovestadt had primary responsibility for arranging the transports.

Mosher reported the matter to DMH which, in the course of its investigation, interviewed the plaintiff and Senechal. Senechal continued to deny the plaintiff's claim, and the investigator suggested that deoxyribonucleic acid (DNA) testing of Senechal would supply the answer to the plaintiff's claim.

At the time of the investigator's report, Senechal was working at a different facility run by HES. When Johnston received the DMH investigator's report, he discussed it with Senechal, including the investigator's suggestion that Senechal provide a DNA sample. At first, Senechal said he was willing to take the test, but when informed by Johnston that a positive result would result in his discharge, he refused.[7]

The matter was submitted to the jury on special questions that presented two discrete theories of liability. They were: (1) that Senechal's sexual activities with the plaintiff before June 23, 1995, constituted intentional infliction of emotional distress, and that the other defendants were negligent before June 23 in failing to anticipate those relations and the emotional distress they produced; and (2) that in failing to investigate and acknowledge what had occurred after June 23, all of the defendants (Senechal intentionally, the other defendants negligently) inflicted further emotional distress on the plaintiff.

In answer to special questions, the jury found: (1) Senechal intentionally inflicted emotional distress on the plaintiff before June 23, 1995, by having sexual relations with her, and intentionally inflicted emotional distress upon the plaintiff after June 23, by his actions in denying her claims; (2) Hovestadt was negligent in failing, before June 23, 1995, to prevent Senechal from driving the plaintiff unescorted and that such

---

[7]After the plaintiff brought her action against Senechal and the other defendants, Senechal consistently denied that he had had sexual intercourse with the plaintiff. A Superior Court judge ordered Senechal to provide a buccal swab sample for DNA testing. Senechal refused and appealed the order to a single justice of this court, who denied relief. The Supreme Judicial Court granted Senechal's petition for further appellate review. That court affirmed the Superior Court judge's order. See *Doe* v. *Senechal*, 431 Mass. 78, 80 (2000).

During the plaintiff's trial, but before he testified, Senechal told the plaintiff's counsel, the trial judge, and defense counsel that he intended to testify that he did indeed have sexual intercourse with the plaintiff. He was called as a witness by the plaintiff and so testified.

negligence was the proximate cause of the sexual relations between Senechal and the plaintiff, but that Hovestadt was not negligent after June 23 in failing to investigate; and (3) Johnston and Mosher were not negligent before June 23, 1995, in failing to prevent Senechal from driving the plaintiff unescorted, but both were negligent after June 23, in failing to investigate the plaintiff's claims, and such negligence was a proximate cause of the harm to the plaintiff.

We now discuss the parties' appeals.

A. *The plaintiff's appeal.*

1. *The allowance of Mosher and Johnston's motion for judgment notwithstanding the verdict.* In their motion for judgment notwithstanding the verdict, Johnston and Mosher claimed there was no evidence that they had a duty to investigate after learning of Senechal's actions and the plaintiff's subsequent pregnancy. They also contended that there was no evidence of any harm to the plaintiff as a direct and proximate result of their alleged failure to investigate. Finally, they argued that they were prejudiced by the judge's allowance, after Johnston and Mosher had rested their cases, of an amendment to add negligent infliction of emotional distress in regard to the alleged failure to investigate claim.

The judge allowed Johnston and Mosher's motion for judgment notwithstanding the verdict. He ruled that there was no evidence that their alleged failure to investigate after learning of Senechal's actions resulted in direct physical harm to the plaintiff. The judge further ruled that he had committed error in allowing the plaintiff's amendment after the parties had rested. Finally, he concluded that the verdict that Johnston and Mosher were negligent for failing to investigate, which negligence caused emotional distress, was not supportable because there was no duty to investigate and insufficient proof of causation and damages.

On appeal, the plaintiff contends that the judge committed error in allowing Johnston and Mosher's motion for judgment notwithstanding the verdict. She claims that there was sufficient evidence of a duty to investigate and also of compensable damages. The plaintiff also claims that the judge committed error in holding that Johnston and Mosher were prejudiced by the

adding back of the negligent infliction of emotional distress claims as a result of Johnston and Mosher's failure to investigate.

a. *Failure to investigate — direct personal injuries.* In reviewing a ruling on a directed verdict or a judgment notwithstanding the verdict, the question before us is the same: that is, "whether 'anywhere in the evidence, from whatever source derived, any combination of circumstances could be found from which a reasonable inference could be drawn in favor of the plaintiff.' " *Raunela* v. *Hertz Corp.*, 361 Mass. 341, 343 (1972), quoting from *Kelly* v. *Railway Exp. Agency, Inc.*, 315 Mass. 301, 302 (1943). "We do not weigh the evidence or consider the credibility of witnesses." *Conway* v. *Smerling*, 37 Mass. App. Ct. 1, 3 (1994), citing *Rubel* v. *Hayden, Harding & Buchanan, Inc.*, 15 Mass. App. Ct. 252, 254 (1983). "Evidence that contradicts the testimony of the nonmoving party is to be ignored." *Conway* v. *Smerling*, 37 Mass. App. Ct. at 3, citing *Bennett* v. *Winthrop Community Hosp.*, 21 Mass. App. Ct. 979, 982 (1986).

"There are four elements to a negligence claim: (1) a legal duty owed to the plaintiff by the defendant; (2) a breach of that duty by the defendant; (3) causation; and (4) actual loss by the plaintiff." *Delaney* v. *Reynolds*, 63 Mass. App. Ct. 239, 241 (2005). See *Glidden* v. *Maglio*, 430 Mass. 694, 696 (2000). Thus, the plaintiff in this matter was required to prove that Johnston and Mosher had a legal duty to investigate the plaintiff's claim that Senechal had sexual intercourse with her, that they failed to do so, and that their failure caused direct personal injuries to the plaintiff.

There was no evidence, and the plaintiff does not argue, that the alleged failure to investigate caused the plaintiff direct physical harm independent of the emotional distress. Therefore, without the negligent infliction claim, the judge did not commit error in allowing Johnston and Mosher's motions for judgments notwithstanding the verdicts because the evidence did not support a recovery for simple negligence — the only claim that was actually tried.

b. *Prejudice from adding back negligent infliction of emotional distress claims.* The claim that the failure to investigate caused emotional distress came into the trial in the

following manner. As we have noted, the plaintiff, on the first day of trial, voluntarily dismissed her claims of negligent infliction of emotional distress against Hovestadt, Johnston, and Mosher, having already stipulated to the dismissal of her claims for intentional infliction of emotional distress against them. Therefore, the case was tried against these defendants as a simple negligence case with the plaintiff required to show physical injuries.

After they rested their respective cases, the judge held a conference with the parties' lawyers to discuss the defendants' motions for directed verdicts. During the conference, the plaintiff offered an oral amendment to add claims that the defendants' failure to investigate caused her emotional distress, the claims that she had voluntarily dismissed on the first day of trial. Johnston and Mosher objected to the amendment, claiming prejudice. The judge allowed the amendment under Mass.R. Civ.P. 15(a), 365 Mass. 761 (1974).

The judge revisited his ruling on the motion to amend while considering Johnston and Mosher's motion for judgment notwithstanding the verdict. Reviewing the evidence up to the time that he allowed the amendment, the judge ruled that Johnston and Mosher were prejudiced by his allowance of the motion. Therefore, the judge ruled that the claim alleging their failure to investigate caused emotional distress should not have been considered by the jury. The plaintiff claims error.

"[A] motion to amend should be allowed unless some good reason appears for denying it." *Castellucci* v. *United States Fid. & Guar. Co.*, 372 Mass. 288, 289 (1977). "However, '[i]t is well-settled that prejudice to the non-moving party is the touchstone for the denial of an amendment.' " *Hamed* v. *Fadili*, 408 Mass. 100, 105 (1990), quoting from *Goulet* v. *Whitin Mach. Works, Inc.*, 399 Mass. 547, 550 n.3 (1987).

Here, the amendment came at the close of all of the evidence. It added a theory that had been expressly waived at the beginning of the trial.

It is clear from the evidence that Johnston and Mosher relied on the early waiver of the negligent infliction claims against them. They released expert witnesses and did not, to any extent, contest the plaintiff's evidence, which in any event, failed to

make a case on the simple negligence claim that was tried after the waiver. See part A.1.a., *supra* at 76. We agree with the judge that Johnston and Mosher were indeed prejudiced and the judge's posttrial decision to disallow the plaintiff's amendment of the complaint was within his discretion. See *Castellucci* v. *U.S. Fid. & Guar. Co.*, 372 Mass. at 292-293.

2. *The allowance of summary judgment on Federal and State civil rights claims.* A judge, not the trial judge, allowed partial summary judgment in favor of Senechal, Hovestadt, Johnston, Mosher, Westlake, and HES on the plaintiff's claims for alleged violations of Federal and State civil rights. The plaintiff appealed.[8]

a. *The alleged violation of the Massachusetts Civil Rights Act.* The plaintiff, in various counts in her complaint, alleged that the defendants violated the Massachusetts Civil Rights Act (MCRA). See G. L. c. 12, §§ 11H, 11I.

"To establish a claim under the [MCRA] the plaintiff[] must prove that (1) [his or her] exercise or enjoyment of rights secured by the Constitution or laws of either the United States or of the Commonwealth, (2) have been interfered with, or attempted to be interfered with, and (3) that the interference or attempted interference was by 'threats, intimidation or coercion.' " *Reproductive Rights Network* v. *President of the Univ. of Mass.*, 45 Mass. App. Ct. 495, 505 (1998), quoting from *Swanset Dev. Corp.* v. *Taunton*, 423 Mass. 390, 395 (1996).

---

[8]Because of actions by the plaintiff following the allowance of partial summary judgment, we do not consider any appeals as to HES and Westlake from the decision of the motion judge.

Prior to trial, the parties stipulated that "all claims of the plaintiff against [HES] and [] Westlake [are] dismissed with prejudice. . . . "

At oral argument, we informed the plaintiff's appellate counsel that we interpreted the stipulation of dismissal to mean that HES and Westlake were no longer involved in the plaintiff's appeal from the allowance of summary judgments as to them.

Appellate counsel, who was trial counsel, reacted with surprise at our interpretation, claiming that he did not intend by the stipulation to dismiss the appeals. Yet, neither at argument nor postargument did he point to any evidence in the record that was contrary to our interpretation.

We also note that HES and Westlake did not submit briefs in opposition to the plaintiff's appeal, lending support to our interpretation of the stipulation agreement.

The plaintiff claimed that Senechal's conduct violated arts. 1, 10 and 14 of the Massachusetts Declaration of Rights. The motion judge disagreed and held that even if there was such a violation, the plaintiff's claim fails because there was no evidence of threats, intimidation or coercion as required to establish a claim under the MCRA. We agree with the motion judge.

In *Planned Parenthood League of Mass., Inc.* v. *Blake*, 417 Mass. 467, 474, cert. denied, 513 U.S. 868 (1994), the court defined the terms "threats, intimidation, or coercion." It stated a " '[t]hreat' . . . involves the intentional exertion of pressure to make another fearful or apprehensive of injury or harm. . . . 'Intimidation' involves putting in fear for the purpose of compelling or deterring conduct. . . . [Coercion involves] 'the application to another of such force, either physical or moral, as to constrain [her] to do against [her] will something [she] would not otherwise have done.' " *Ibid.*, quoting from Webster's New Intl. Dictionary 519 (2d ed. 1959).

There was no evidence in the summary judgment materials that Johnston, Mosher or Hovestadt employed any threats, intimidation, or coercion on the plaintiff. Therefore, we focus on Senechal's conduct.

In *Buster* v. *George W. Moore, Inc.*, 438 Mass. 635, 646-647 (2003), the court noted that "coercion may take various forms, and we have not limited its scope to actual or attempted physical force." However, there must be some act by a defendant which, objectively viewed, would cause a person not to exercise a constitutional right or deprive that person of that right. See *Ayasli* v. *Armstrong*, 56 Mass. App. Ct. 740, 749 (2002) ("Whether conduct constitutes threats, intimidation, or coercion under the statute is tested by a reasonable person standard").

We grant that Senechal's conduct was reprehensible. However, improperly taking advantage of a situation does not constitute coercion. There was no evidence that Senechal used physical or moral force against the plaintiff to constrain her against her will to do something she would not otherwise have done. See *id.* at 751. The motion judge did not commit error in allowing summary judgment on the plaintiff's MCRA claims.

b. *The alleged violation of the Federal Civil Rights Act.* The

plaintiff asserts in various counts of her amended complaint that the defendants violated 42 U.S.C. § 1983, the Federal Civil Rights statute. The motion judge disagreed and granted summary judgment. We agree with the motion judge.

To establish a claim under § 1983, a plaintiff must allege (1) that the defendants acted "under color of state law" and (2) that the defendants deprived the plaintiff of rights, privileges, or immunities secured by the Constitution or laws of the United States. *Parratt* v. *Taylor*, 451 U.S. 527, 535 (1981). Here, however, there is no claim that the Commonwealth either directly or through its regulations caused the alleged sexual intercourse to occur. Therefore, the alleged wrong was not "compelled or even influenced by any state regulation." *Rendell-Baker* v. *Kohn*, 457 U.S. 830, 841 (1982).

Because the Commonwealth had no involvement in the matter, the focus is on whether Westlake was performing a traditional and exclusive State function. See *Phillips* v. *Youth Dev. Program, Inc.*, 390 Mass. 652, 654 (1983). It can be argued with some force that treatment of the mentally ill is a traditional and exclusive State function. However, the United States Court of Appeals for the First Circuit and other Federal courts have held that the involuntary treatment of the mentally ill "has by no means been the exclusive prerogative of the State." *Rockwell* v. *Cape Cod Hosp.*, 26 F.3d 254, 259 (1st Cir. 1994). See *Spencer* v. *Lee*, 864 F.2d 1376, 1383 (7th Cir. 1989).

The plaintiff argues that there is such a close relationship or nexus between the Commonwealth and Westlake and HES that Senechal can be considered a State actor. The United States Supreme Court and Federal courts of appeals have identified several factors that are insufficient to justify finding a close nexus between the state and a private actor.

Westlake was extensively regulated by DMH. It has been held, however, that the State's extensive regulation is not sufficient to justify a finding of a close nexus. See *Rendell-Baker* v. *Kohn*, 457 U.S. at 841-842 (private school's personnel decisions not attributable to the State despite extensive regulation of the school generally). See also *Blum* v. *Yaretsky*, 457 U.S. 991, 1004 (1982). Westlake was heavily funded by the Commonwealth, but that also is not enough to establish a close

nexus between the Commonwealth and the private actors. See *Rendell-Baker* v. *Kohn, supra* at 840 (holding that despite the fact that virtually all of the private school's income was obtained from governmental funding, its personnel decisions were not attributable to the State). See also *Blum* v. *Yaretsky, supra* at 1011.

There is no question that there existed some nexus between the Commonwealth and Westlake and HES. But we agree with the motion judge that the nexus was not so extensive as to support a conclusion that the State had "so far insinuated itself into a position of interdependence with the [private party] that it was a joint participant in the enterprise." *Harvey* v. *Harvey,* 949 F.2d 1127, 1131 (11th Cir. 1992), quoting from *NBC* v. *Communications Workers of America, AFL-CIO,* 860 F.2d 1022, 1026 (11th Cir. 1988). See *Milonas* v. *Williams,* 691 F.2d 931, 940 (10th Cir. 1982).

We agree with the motion judge that the defendants cannot be considered State actors and therefore summary judgment was properly granted on the Federal civil rights claims.

3. *Amendment of the judgments.* The parties filed cross motions to amend the judgments. The judge allowed Johnston and Mosher's motion and denied the plaintiff's. On appeal, she claims that the judge erred when he ruled that Hovestadt could not be held liable for damages arising from Senechal's dissembling and denials after the plaintiff became pregnant.

The docket entries as to the verdicts stated that the plaintiff was to receive $1,250,000 from Senechal and $750,000 from Hovestadt. The judge ruled that the judgments were in error and contrary to the verdicts rendered by the jury. He amended the judgments to read that the plaintiff was to recover from Senechal $500,000 plus interest, and from Senechal and Hovestadt, $750,000 plus interest. The judge's ruling caused the damages to better reflect the jury's findings on the liability of Hovestadt. There was no error.

B. *Hovestadt's appeal.*

1. *The denial of Hovestadt's motion for judgment notwithstanding the verdict.* The jury found Hovestadt to be negligent in failing to prevent the sexual contacts between Senechal and the plaintiff. Hovestadt filed motions for a directed verdict and

judgment notwithstanding the verdict. In regard to the latter, Hovestadt claimed that the evidence did not support a finding that he allowed Senechal to escort the plaintiff alone in Senechal's vehicle, and that it was not foreseeable that the two would engage in sexual intercourse on those trips. The judge denied the motion and Hovestadt claims error.

We view the evidence in the light most favorable to the plaintiff. See *Berkshire Armored Car Servs. Inc.* v. *Sovereign Bank of New England,* 65 Mass. App. Ct. 96, 97-98 (2005). As residential director of Westlake, Hovestadt was aware of the plaintiff's mental illness and her propensity to behave in a sexually provocative manner toward males. He also knew of Westlake's policy that, because of her conduct, the plaintiff was not to be alone with a male staff member at any time. Hovestadt's duties included primary responsibility (along with the plaintiff's social worker) for arranging the transportation of the plaintiff and other residents.

The decision that Senechal would drive the plaintiff alone was made at one or more clinical meetings at which both Hovestadt and Senechal were present. Before the decision was made, Senechal had stated at a clinical meeting that it appeared that the plaintiff had a "crush" on him. After Senechal had driven the plaintiff on her first trip to and from South Station, two staff members approached Hovestadt and told him that they thought Senechal should not be transporting the plaintiff alone considering her mental condition and her apparent attachment to Senechal. Hovestadt responded that he believed that Senechal should be able to handle himself.

In addition, the plaintiff presented expert testimony that a reasonably prudent administration in a facility such as Westlake would both have procedures and follow them to ensure that male staff and female residents were not alone together. In view of the plaintiff's pattern of sexual acting out, the expert opined it was not prudent to permit one-on-one transports by a male staff member.

In sum, there was sufficient evidence to permit the jury to conclude that Hovestadt's decision to allow Senechal to escort the plaintiff alone was negligent, that he participated in the decision, had the final say in it, and was warned about the risks

arising from it. Further, it was reasonably foreseeable, in view of the plaintiff's history of mental illness, and her feelings toward Senechal, that sexual contact would occur.

The judge did not commit error in denying Hovestadt's motion for judgment notwithstanding the verdict.

2. *Denial of Hovestadt's motion for a new trial.* Hovestadt claims that the judge committed error in denying his motion for a new trial. In his appeal he claims that the motion should have been allowed because the judge committed error at trial by (1) denying Hovestadt's motion to sever his trial from Senechal's; (2) denying Hovestadt's request to separate him from Senechal in the verdict slip and to instruct the jury on the practical effect of joint and several liability; and (3) instructing the jury that, because of Senechal's refusal to take a DNA test, they were bound to a ruling that Senechal was the baby's biological father.

"An appellate court will not reverse a lower court's denial of a new trial motion absent an error of law or abuse of discretion." *CBI Partners Ltd. Partnership* v. *Chatham*, 41 Mass. App. Ct. 923, 926-927 (1996). We have examined all of Hovestadt's claims. We hold there was no error of law or abuse of discretion.

*Conclusion.* We affirm the amended judgments entered against Senechal and Hovestadt. We affirm the allowance of Johnston and Mosher's motion for judgment notwithstanding the verdict. We affirm the denial of Hovestadt's motion for judgment notwithstanding the verdict and the denial of his motion for a new trial.

We affirm the grant of partial summary judgment in favor of Senechal, Johnston, Mosher, and Hovestadt.

*So ordered.*